**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NOREEN D.,**

                **Plaintiff,**

**v.**                                 **6:18-CV-00722**
                                          **(NAM)**

**NANCY A. BERRYHILL, Acting Commissioner**
**of Social Security,**

                **Defendant.**
_____

**Appearances:**

Counsel for Plaintiff:
B. Brooks Benson, Esq.
Office of Peter M. Hobaica, LLC
2045 Genesee Street
Utica, New York 13501

Counsel for Defendant:
Grant C. Jaquith, United States Attorney
Johanny Santana, Special Assistant United States Attorney
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

    **I.    INTRODUCTION**

        Plaintiff Noreen D. filed this action under 42 U.S.C. §§ 405(g), 1383(c), and 28 U.S.C. §

1361 challenging the denial of her application for Disability Insurance Benefits ("DIB") under

the Social Security Act ("the Act"). (Dkt. No. 1). The parties' briefs, filed in accordance with

N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 11, 13). After carefully

reviewing the Administrative Record (Dkt. No. 8), and considering the parties' arguments, the Court affirms the Acting Commissioner's decision that Plaintiff was not disabled under Sections 216(i) or 223(d) of the Act.

## II.    BACKGROUND

### A.  Procedural History

Plaintiff initially applied for disability benefits on November 20, 2014, alleging that she had been disabled since June 6, 2014 due to degenerative disc disease, fibromyalgia, irritable bowel syndrome ("IBS"), gastroesophageal reflux disease ("GERD"), migraines, carpal tunnel syndrome, and depression. (R. 12). The Social Security Administration (the "SSA") denied Plaintiff's initial application on February 11, 2015. (R. 76–80). Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 82–83). That hearing was held on October 7, 2016 before ALJ Roxanne Fuller. (R. 31–66). Plaintiff testified and was represented by counsel at the hearing. On January 13, 2017, the ALJ issued a decision finding that Plaintiff was not disabled. (R. 7–30). Plaintiff's subsequent request for a review by the Appeals Council was denied. (R. 1–5). Plaintiff commenced this action on June 20, 2018. (Dkt. No. 1).

### B.  Plaintiff's Background and Testimony

Plaintiff was born in 1962. (R. 173). She is a high school graduate and was enrolled in regular education courses. (R. 197, 467). From 2002 through 2014 Plaintiff worked at several automotive dealerships in Florida and New York assisting her employers with sales, parts, and customer service. (R. 36–39). Plaintiff stopped working following her involvement in a June 2014 automobile accident. (R. 467). Plaintiff has not been employed since. (R. 204, 859).

At the hearing on October 7, 2016, Plaintiff stated that she suffered from neck pain that radiates in both shoulders, in her jaw, and in her ear. (R. 41). She stated that the pain goes down her spine and that her back feels like it "is being twisted, contorted, and compressed." (R. 41). Plaintiff described tingling and numbness in her arms and hands. (R. 43). She described the pain as "excruciating" and stated that: "I have trouble walking with my feet, . . . it feels like I'm crushing my bones when I walk, and it's just when I'm walking it hurts, and when I'm sitting up, my feet hurt." (*Id*.). She stated that she sleeps for only two to three hours per night. (Dkt. No. 46). Plaintiff estimated that she could walk for ten to fifteen minutes before needing to stop and rest for five to ten minutes. (R. 44). Plaintiff was hospitalized in July 2016 after falling down her basement stairs. (*Id*.). She also described experiencing unpredictable bouts of diarrhea on a regular basis, and stated that she suffered from ocular migraines that sometimes interfered with her vision. (R. 51, 53).

With regard to her daily living, Plaintiff also testified that she lived with a friend, who does most of the household chores, including: all of the grocery shopping, all of the laundry, and all of the cooking. (R. 49). Plaintiff testified that she could take her dog out, wash her dishes, and make her bed. (*Id*.). She stated that she could pay bills, count change and handle a savings account independently, and acknowledged that her ability to handle her finances did not change as a result of her conditions. (R. 216, 470).

In January 2015, Plaintiff reported that she could do general cleaning, and was able to dress, bathe, and groom herself. (R. 474). She reported showering once a week and dressing twice a week. (*Id*.). Plaintiff reported that she gets along well with friends and family, and typically spends her days doing some chores, socializing, reading, watching television, and

listening to the radio.  (R. 469).  She reported that she could drive and use public transportation.  (*Id.*).

### C.  Medical Evidence of Physical Disability

Plaintiff's claim for disability benefits stems from injuries she sustained in a motor vehicle accident in June 2014.  (R. 266–72).  After the accident, Plaintiff was taken to the hospital for evaluation, x-rays, and an MRI.  (R. 483).  Plaintiff complained of shoulder, head, and calf pain, along with numbness in her left buttock.  (R. 269).  The attending physician noted that Plaintiff had normal strength and exhibited no sign of acute distress.  (R. 271).  Plaintiff exhibited normal range of motion despite tenderness.  (*Id.*).  The CT scan of claimant's cervical spine was "negative for acute fractures," and showed "probable chronic degenerative changes at C5-C6 with mild posterior disc bulge and a disc bulge at C4-C5 with extrinsic compression of the anterior spinal cord and thecal sac."  (R. 377).  The CT scan of her lumbar spine revealed "mild degenerative change," but "no acute abnormality [was] evident."  (R. 340).  Plaintiff was discharged with an instruction to "follow up with [her] primary care [provider]."  (R. 436).  The attending physician opined that Plaintiff could return to work with a few days.  (R. 278).

### 1.  Dr. Dignant Nanavati, Primary Care Physician

On June 17, 2014, Plaintiff presented to her primary care provider, Dr. Dignant Nanavati, reporting continued back, shoulder, and neck pain with tingling and numbness in her left arm.  (R. 370).  Dr. Nanavati observed no signs of acute distress, but noted that Plaintiff was suffering from neck, back and lower extremity pain and tenderness..  (R. 366).  Dr. Nanavati prescribed pain medication and cleared Plaintiff to return to work within several days.  (*Id.*).

Plaintiff attended follow-up appointments related to her injuries with Dr. Nanavati on June 20, July 1, and July 14 at which she continued to complain of arm, shoulder, neck, and back

pain.  (R. 370–72, 379–81, 383–85).  Dr. Nanavati extended her return to work date until July 14, 2014.  (R. 373, 374, 382).  Plaintiff was not seen by Dr. Nanavati again for her accident-related injuries, but saw him for other ailments and conditions on September 8, 2014 (R. 397–99, denying any musculoskeletal symptoms), October 10, 2014 (R. 412–14, denying any musculoskeletal symptoms), and November 10, 2014 (R. 428–31, presented with "normal gait" and "normal posture").

Dr. Nanavati and Nurse Practitioner Sue Stucker saw Plaintiff a number of times in 2015 and 2016 for heartburn, hypertension, and depression.  (R. 764–803, 902–920).  In October 2015, Plaintiff presented to Dr. Nanavati for heartburn and hypertension.  (R. 771–74).  Plaintiff denied experiencing any musculoskeletal symptoms, but reported suffering from bipolar disorder, depression, and insomnia.  (R. 771).  Through 2016, Plaintiff presented to Nanavati and Stucker reporting that she was suffering from depression, anxiety, and bipolar disorder.  (*See generally* R. 283–432, 764–803, 902–920).  For example, on April 13, 2015, Plaintiff described frequent crying, fatigue, irritability, and lack of usual pleasurable activities.  (R. 782).  Plaintiff later denied experiencing anxiety or depression in December 2015.  (R. 768).

Aside from a finger injury, Plaintiff largely denied any additional musculoskeletal symptoms to Dr. Nanavati after September 8, 2014. (*See* R. 283–432, 764–803, 902–920). However, in August 2016, Plaintiff reported having some back pain, but denied any limitations of movement.  (R. 902).

Plaintiff reported limited gastrointestinal issues to Dr. Nanavati, but reported bloody stool in September 2014.  (R. 397).  Aside from occasional reports of symptoms related to GERD, Plaintiff denied experiencing any gastrointestinal symptoms after her appointment with Dr. Nanavati on October 10, 2014.  (*See* R. 412–432, 764–803, 902–920).

On October 11, 2016, Dr. Nanavati completed a Medical Source Statement which indicated that Plaintiff suffered from a history of chronic pain, specifically: back pain, neck pain, osteoarthrosis, and fibromyalgia. (R. 974). Dr. Nanavati's statement opined that Plaintiff was incapable of lifting or carrying objects weighing ten (10) pounds or more. (R. 975). He estimated that Plaintiff could sit, stand, or walk for no more than 15 minutes at a time, and only for a total of eight (8) hours per day. (R. 976). Dr. Nanavati opined that Plaintiff could occasionally, reach, handle, feel and push and pull, but could not climb ladders, stoop, kneel, crouch or crawl. (R. 977–78). He noted that Plaintiff could shop, ambulate without a wheelchair or cane, walk a block at a reasonable place on a rough surface, climb a few steps, prepare a simple meal, provide for her own personal hygiene and could frequently operate a motor vehicle. (R. 979–80). Dr. Nanavati also estimated that Plaintiff would be "off task" for 25 percent or more of an average workday. (R. 980).

### 2. Cook Physical Therapy

Plaintiff began physical therapy at Cook Physical Therapy in June 2014 for treatment of accident-related pain in her arms, neck, back and buttocks. (R. 375–76). The therapist diagnosed Plaintiff with cervical radiculopathy and lumbar strain, and scheduled Plaintiff to attend continued physical therapy three (3) times per week. (R. 376). By September 2014, the physical therapist noted Plaintiff's improvement with therapy, stating that her "intermittent low back pain which is 3/10 in intensity as compared to 10/10 in intensity on initial evaluation." (R. 406). He added that Plaintiff "reports a considerable reduction in the intensity of her symptoms following her physical therapy treatments." (*Id.*).

### 3. Syracuse Orthopedic Specialists

Plaintiff was initially seen at Syracuse Orthopedic Specialists ("SOS") on July 24, 2014 for neck and back pain. (R. 455). The examining physician assistant noted that Plaintiff demonstrated normal gait, but exhibited moderate pain. The examiner reviewed the x-ray and CT reports conducted at the hospital following Plaintiff's accident and found "no acute pathology." (R. 458). On August 11, 2014, Plaintiff returned to SOS for further evaluation and review of MRI results. (R. 451–54). The MRI results indicated a "small annular tear and protrusion at L4-5" and "mild disc bulging at C4-7 with no significant central canal or neuroforaminal stenosis." (R. 454). SOS determined that Plaintiff was not a candidate for surgery, and informed Plaintiff that her recovery would take more time and therapy. (*Id*.).

On September 17, 2014, an SOS examiner determined that Plaintiff was making progress with physical therapy, but "still ha[d] some difficulties with range of motion in her neck." (R. 447). The doctor noted that Plaintiff would remain out of work on total disability until her next visit or until further notice. (R. 450). On October 27, 2014, SOS referred Plaintiff to New York Spine & Wellness ("NYSW") for further non-operative pain treatments. (R. 445).

In January 2016, an MRI performed by SOS found "a new small right subarticular disc herniation extrusion type at L3-4." (R. 613). The examiner opined that "[t]his may be compressing the right L3 nerve root. Small central disc protrusion at L4-5 is unchanged." (*Id*.).

### 4. New York Spine & Wellness

In November 2014, Plaintiff presented to NYSW complaining of neck, back, and left arm pain. (R. 741). Plaintiff reported a current pain level of 5/10, with an average pain level of 6/10, and a maximum pain level of 9/10. (*Id*.). At this initial evaluation, Plaintiff was prescribed Gabapentin, was encouraged to begin chiropractic treatment, and was scheduled for an

7

Electromyography ("EMG"). (R. 745). The EMG indicated that "all nerve conduction studies were within normal limits." (R. 754). Plaintiff continued regular assessment appointments with NYSW through 2016 and received various conservative pain treatments, including: nerve blocks, high-voltage stimulation, hot moist pack, and spinal manipulation. (*See* R. 650–746, 921–37). Records from these visits indicate that Plaintiff continued to report ongoing pain and numbness throughout her body through the full course of treatment. (*Id.*).

### 5. Arthritis Health Associates

In August 2016, Dr. Nanavati referred Plaintiff to Arthritis Health Associates ("AHA") after her blood work indicated elevated C-reactive protein ("CRP"). (R. 908, 946). Rheumatologist Dr. Mary Abdulky's notes indicate that Plaintiff had 18 out of 18 tender points, elevated CRP, and exhibited soft tissue discomfort. (*See* R. 946–50). Dr. Abdulky diagnosed Plaintiff with fibromyalgia and advised her "to do low impact aerobics, gentle stretching . . . and treat [her] fibromyalgia with lifestyle modifications." (R. 948). When Plaintiff returned for a follow-up, she was also diagnosed with possible carpal tunnel syndrome. (R. 969–73).

### 6. Dr. Susama Verma

Plaintiff was seen by Dr. Susama Verma for migraine headaches in April 2016. (R. 865–67). Plaintiff reported daily headaches resulting in moderate to severe pain with throbbing and squeezing effect on her entire head. (R. 865). Dr. Verma prescribed amitriptyline for her headaches and insomnia. (R. 867).

On May 24, 2016, Plaintiff reported back to Dr. Verma for a follow-up where she described mild improvements in her headaches and sleep, but complained of memory and attention impairments. (R. 861). Dr. Verma increased Plaintiff's amitriptyline dosage and ordered an MRI to rule out structural lesions. (R. 863).

On July 7, 2016, Plaintiff presented for another appointment with Dr. Verma where she reported decreased intensity, frequency, and duration of her headaches since her last visit. (R. 858). Plaintiff reported improvements in her sleep quantity and quality. (*Id*.). Plaintiff's MRI results indicated a "tiny chronic lacunar infarct vs prominent perivascular space at left thalamus." (*Id*.). Dr. Verma observed that Plaintiff's gait and station were normal and her muscle strength in her upper and lower extremities was normal. (R. 860). Dr. Verma instructed Plaintiff to continue treatment as previously prescribed. (*Id*.).

### 7. Rome Memorial Hospital, Emergency Department

On January 23, 2016, Plaintiff presented to the Emergency Department at Rome Memorial Hospital after she "awoke with pain in [her] left leg with weakness and numbness." (R. 566). The attending physician noted that Plaintiff demonstrated no acute distress, and her x-rays were normal. (R. 566–71). Plaintiff was diagnosed with lumbar radiculopathy in her left leg and discharged with an instruction to follow-up with her spine doctor. (R. 572).

On July 29, 2016, Plaintiff fell down a flight of stairs at home and reported to Rome Memorial Hospital complaining of pain in multiple sites. (R. 869–74). The treating physician at the hospital found that Plaintiff was not in acute distress, and demonstrated normal gait and reflexes. (R. 872). She was diagnosed with a sprain of her left ankle and left knee arthritis. (R. 951).

### 8. Chestnut Commons Physical Therapy

In 2016, Plaintiff attended physical therapy at Chestnut Commons for her continuing back pain and for her left knee and left ankle pain from the fall down the stairs. (R. 951–68). Plaintiff reported that the prescribed exercises were "helping a little," but complained about continued ankle soreness and concern about her balance. (R. 954).

### 9. Seneca Chiropractic & Family Wellness

Plaintiff was treated at Seneca Chiropractic a number of times in 2015 for her pain symptoms. (R. 480–504). Plaintiff reported being in pain "all the time" and noted that it interfered with her ability to work, sleep, and carry on a daily routine. (R. 498). On January 9, 2015, Plaintiff reported a pain level of 8, but by January 26, Plaintiff reported that her pain level had subsided to a level 4. (R. 485, 495). It was noted that Plaintiff was "improving slowly" and that the "level of tenderness ha[d] decreased from a 10 to a 6." (*Id.*).

### 10. Psychological Healthcare, PLLC

Plaintiff was seen by Lisa McDermott at Psychological Healthcare, PLLC from February 2015 through February 2016. (R. 804–39). Progress notes from these visits indicate consistent symptoms of depression, low self-esteem, anxiety, and cognitive dysfunction. (*Id.*).

### 11. Dr. Anil Verma

Plaintiff was treated by psychiatrist, Dr. Anil Verma, in May and June of 2016 for her ongoing depression. (R. 856–68). Dr. Anil Verma diagnosed Plaintiff with Bipolar 2 Disorder and Attention-Deficit/Hyperactivity Disorder. (*Id.*).

### 12. The Neighborhood Center, Inc.

In September 2016, Plaintiff presented to the Neighborhood Center seeking psychological care. Plaintiff reported feeling withdrawn from others, and noted that she did not enjoy life. (R. 989). Plaintiff explained that she "does not want to be around anyone," and described that her "low mood could last for week to a couple months." (*Id.*). Plaintiff described struggling with the death of her son. (*Id.*). Plaintiff was diagnosed with adjustment disorder with depressed mood. (R. 997). A treatment plan was developed to treat Plaintiff's diagnoses.

(R. 985–88). On October 14, 2016, the therapist changed Plaintiff's diagnosis to "bipolar 2 most recent episode depressed." (R. 982–88).

### D. Consultative Examiners

#### 1. Dr. Dennis M. Noia

In January 2015, Plaintiff was seen by Dennis Noia, Ph.D., for a psychiatric consultative examination. (R. 466–71). Plaintiff reported symptoms of depression, including dysphoric moods, crying spells, loss of interest, fatigue, loss of energy, and problems with concentration and memory. (R. 468). She did not report any "significant manic or anxiety related symptoms" and denied suicidal ideation. (*Id*.). Dr. Noia reported that Plaintiff's mood was calm and that she appeared relaxed and comfortable. (R. 469). Plaintiff exhibited good insight and good judgment, with intellectual functioning in the low average range. (*Id*.). Dr. Noia noted that Plaintiff's thought processes were coherent and not burdened by delusions, hallucinations, or disordered thinking. (*Id*.).

With regard to Plaintiff's mode of living and functioning, Plaintiff reported that she could dress, bathe, and groom herself. (R. 469). She reported to Dr. Noia that she could cook and prepare food, do general cleaning, laundry, occasional shopping with assistance, manage money, drive, and use public transportation. (*Id*.). Plaintiff reported that she needs to work slowly and rest frequently. (R. 469–70). Plaintiff reported that she spends her days doing chores, socializing, reading, watching television, and listening to the radio. (R. 470).

Dr. Noia completed a Medical Source Statement for Plaintiff, which concluded that:

> Vocationally, the claimant appears to have no limitations in understanding and following simple instructions and directions. She appears to have no limitations performing simple tasks. She appears to have no limitations performing complex tasks. She appears to have no limitations maintaining attention and concentration for tasks. She appears to have no limitations regarding her ability to

attend to a routine and maintain a schedule. She appears to have no limitations regarding her ability to learn new tasks. She appears to have no limitations regarding her ability to make appropriate decisions. She appears to be able to relate to and interact moderately well with others. There appear to be occasional mild limitations regarding her ability to deal with stress.

(R. 470). Dr. Noia concluded that the "[r]esults of the examination appear to be consistent with psychiatric problems, and this may occasionally interfere with the claimant's ability to function on a daily basis." (*Id.*). Dr. Noia noted that Plaintiff's prognosis was "fair," and stated that "it is hoped that with continued intervention and support, she will find symptom relief and maximize her abilities." (*Id.*).

## 2. Dr. Kalyani Ganesh

In January 2015, Plaintiff was also seen by Kalyani Ganesh, M.D., for a consultative medical examination. (R. 472–77). Dr. Ganesh noted that Plaintiff exhibited normal gait, normal stance, no acute distress, and reported that she was able to walk on heels and toes without difficulty. (R. 474). Dr. Ganesh observed that Plaintiff was able to rise from her chair without difficulty, and assessed Plaintiff's musculoskeletal condition as:

Cervical spine shows full flexion, extension 10 degrees, lateral flexion 10 degrees, and rotation full. No scoliosis, kyphosis, or abnormality in thoracic spine. Lumbar spine shows flexion 60 degrees, extension 15 degrees, lateral flexion and rotation 10 degrees. SLR negative bilaterally. Full ROM of the right shoulder. Left shoulder forward elevation and abduction 140 degrees. Adduction and internal and external rotation full. Elbows, forearms, and wrists full ROM bilaterally. Full ROM of hips, knees, and ankles bilaterally. No evident subluxations, contractures, ankylosis, or thickening. Joints stable and nontender. No redness, heat, swelling, or effusion.

(R. 475). Dr. Ganesh noted that Plaintiff's x-rays demonstrated "some degenerative changes," but concluded that Plaintiff had "no gross limitation sitting, standing, and walking," with "mild limitation lifting, carrying, pushing, and pulling." (R. 476).

## E. ALJ's Decision Denying Benefits

On January 13, 2017, the ALJ issued a decision denying Plaintiff's application for disability benefits. (R. 7–25). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since June 6, 2014, the alleged onset date for her disability. (R. 12).

At step two, the ALJ determined that, under 20 C.F.R. § 404.1520(c), Plaintiff had seven "severe" impairments: degenerative disc disease, fibromyalgia, IBS, GERD, migraines, carpal tunnel syndrome, and depression. (R. 12).

At step three, the ALJ found that, while "severe," Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526)." (R. 12). The ALJ found that Plaintiff had only mild restrictions in daily living activities and had mild difficulties in social functioning. (R. 13). The ALJ noted that Plaintiff reported that she "has some difficulty taking care of her personal hygiene and performing tasks such as dressing and bathing." (*Id*.). The ALJ found that Plaintiff reported living with family that assisted with household tasks. (*Id*.). Plaintiff was found to have "no trouble getting along with friends, family, neighbors and others." (*Id*.). The ALJ concluded Plaintiff had moderate difficulties with concentration, persistence, and pace. (*Id*.). The ALJ noted that Plaintiff reported experiencing mental fogginess, is easily distracted, and becomes easily confused, but also concluded that Plaintiff "can pay bills, count change, and handle a savings account independently." (*Id*.). The ALJ noted that the consultative examiner noted that Plaintiff's attention and concentration were intact, and she was able to do counting, [and] simple calculations." (*Id*.). The ALJ found that Plaintiff has "moderate difficulties in this functional

13

area," and noted that "[t]hese difficulties would be accommodated by a residual functional capacity that limits her to simple, routine, repetitive tasks." (*Id.*).

At step four, the ALJ determined that Plaintiff:

> has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except occasional [sic] climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasional balance, stoop, crouch, kneel, crawl; frequent reaching and overhead reaching with the left non-dominant arm; frequent handling, that is gross manipulation, with both hands; frequent fingering, that is fine manipulation, with both hands; occasional exposure to moving mechanical parts; occasional operating a motor vehicle; occasional exposure to unprotected heights; able to perform simple, routine, repetitive tasks.

(R. 14). In making that finding, the ALJ determined that "[i]n terms of the claimant's degenerative disc disease, fibromyalgia, carpal tunnel syndrome, and migraines, the medical record shows that these conditions are far less limiting than alleged." (R. 15). Specifically, in reviewing the record, the ALJ found that, "[o]verall, the claimant's record shows that she has a history of chronic back pain, shoulder pain, fibromyalgia, and carpal tunnel syndrome. However, there is no evidence suggesting that these conditions are debilitating." (R. 18).

With regard to Plaintiff's depression symptoms, the ALJ similarly concluded that the record indicated that "this condition is far less limiting than the claimant alleged." (R. 19). In reaching that conclusion, the ALJ considered that Plaintiff "frequently reported trouble in her personal life and reflected on how her life has changed since her car accident," and that "claimant reported that she often felt down, depressed, and hopeless and had little interest in doing things." (R. 20). Nevertheless, the ALJ found that "[o]verall, the claimant's record shows that her mental status examinations were generally normal. Her affect was flat on occasion, but there was no evidence that she appeared labile or emotional during medical visits." (R. 21).

With regard to the opinion evidence, the ALJ gave great weight to the attending physician at the hospital, who treated Plaintiff after her accident and concluded that she could return to work within a few days. (R. 21). The ALJ noted that the treating physician's opinion was "consistent with the claimant's medical record, which shows that her symptoms improved significantly with physical therapy." (*Id.*). Specifically, Plaintiff's "orthopedic records from October and November of 2014 indicate that the claimant was in no acute distress and her gait was normal. She could get on and of the examination table without difficulty, and strength and tone were normal in her spine and upper extremities." (R. 21–22).

The ALJ also gave great weight to Dr. Ganesh's opinion that "claimant had no gross limitation in sitting, standing and walking. She had mild limitations in lifting, carrying, pushing, and pulling." (R. 22). Similarly, the ALJ gave great weight to Dr. Noia's opinion that "the claimant appeared to have no limitations in understanding and following simple instructions, performing simple tasks or complex tasks, maintaining attention and concentration for tasks, attend to a routine, and maintain a schedule." (R. 22). The ALJ noted that Dr. Noia's opinion was consistent with his objective observations from the medical exam. (*Id.*).

The ALJ gave "partial weight" to Dr. Harding, the State's psychological consultant "because [that assessment] precede[d] some of the claimant's record as it pertains to her mental health issues." (R. 22). The ALJ noted that "Dr. Harding opined that claimant's mental impairments were non-severe and caused only mild limitation in maintaining social functioning, concentration, persistence and pace. . . . Her speech, thought processes, and executive functions were also normal." (R. 22–23).

While frequently referencing Dr. Nanavati's general treatment notes throughout the decision, the ALJ states that she gave "little weight" to the conclusions in Dr. Nanavati's

Medical Source Statement "because they [we]re inconsistent with the claimant's medical record." (R. 21). The ALJ also gave little weight to Psychological Healthcare's determination that Plaintiff had "severe limitation in in functioning due to her mental health issues" because "it [was] inconsistent with the medical evidence, which shows that claimant's mental status examinations were generally normal." (R. 22). The ALJ stated that "[t]here is no evidence to suggest that the claimant's depression caused severe limitations in functioning." (*Id.*). In sum, the ALJ concluded the step four analysis by acknowledging that "[a]lthough the claimant certainly has medical conditions that limit her ability to function, they are not so severe as to preclude all work." (R. 23).

Finally, at step five, having evaluated Plaintiff's medical limitations, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 24). Specifically, the ALJ refers to the testimony from vocational expert Nicholas Fidanza, who testified at the hearing that an individual with Plaintiff's limitations would be able to perform the requirements of occupations such as an electronics worker, a small products assembler, or a products assembler. (*See* R. 61–62). Fidanza also opined that if Plaintiff was able to perform a sedentary level of exertion, Plaintiff would be able to perform work as a telemarketer, an order clerk, a final assembler, or a call-out operator. (R. 62). On cross examination by Plaintiff's counsel, Fidanza testified that he was not aware of any jobs that would permit the employee to lie down for two (2) hours during the day, and noted that Plaintiff would be unlikely to sustain competitive employment if she exceeded 50 minutes of "off-task" time. (R. 64–65).

Based on Fidanza's testimony, the ALJ found that Plaintiff "was capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 24). Therefore, the ALJ concluded that Plaintiff was not disabled. (R. 25). The Appeals Council reviewed the ALJ's decision and denied Plaintiff's request for further review. (R. 1–6).

## III. DISCUSSION

### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA must use a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. § 404.1520.  The Regulations define residual functional capacity ("RFC") as "the most [a claimant] can still do despite your limitations."  20 C.F.R. § 404.1545.  In assessing the RFC of a claimant with multiple impairments, the SSA considers all "medically determinable impairments, including . . . medically determinable impairments that are not 'severe.'"  *Id*. § 404.1545(a)(2).  The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last.  *Selian*, 708 F.3d at 418.

### B.  Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled.  Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569

F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would have to conclude otherwise." *Id*. at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

### C. Analysis

Plaintiff asserts six arguments in support of her request to have the Commissioner's decision reversed and remanded. (Dkt. No. 11). Specifically, Plaintiff contends that the ALJ erred by: (1) failing to give controlling weight to the Medical Source Statement from Plaintiff's treating physician; (2) failing to properly evaluate the medical evidence of Plaintiff's limitations; (3) failing to properly evaluate Plaintiff's hearing testimony concerning her limitations; (4) failing to develop the record by requesting a functional assessment of Plaintiff's mental limitations; (5) finding that Plaintiff had the physical capacity to perform light work; and (6) relying on the vocational expert testimony as to jobs available to Plaintiff. (*Id*.). The Court will address each of Plaintiff's claims in turn.

### 1. Weight Given to the Plaintiff's Treating Physician

First, Plaintiff asserts that the ALJ improperly applied the treating physician rule by not affording controlling weight to Dr. Nanavati's Medical Source Statement. (Dkt. No. 11, pp. 20– 23). Plaintiff alleges that the ALJ "cherry picks the evidence," and "fails to address (ignores) Dr. Nanavati's findings that Plaintiff would be off task 25% of the work day, and can only occasionally use her hands." (*Id*., p. 21). In response, the Government argues that the

conclusions in Dr. Nanavati's Medical Source Statement were contradicted by other objective medical findings, and points to evidence "which consistently showed normal gait, and full strength in the lower extremities." (Dkt. No. 13, p. 6).

Generally, under the treating-physician rule, a hearing officer owes "deference to the medical opinion of a claimant's treating physician." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). However, "[w]hen a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, . . . the hearing officer need not give the treating source opinion controlling weight." *Id*. When a treating physician's opinions are disregarded, the ALJ must provide "good reasons" for doing so. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, Plaintiff argues that the "medical evidence is completely consistent with Dr. Nanavati's findings." (Dkt. No. 11, p. 22). However, the generally moderate limitations indicated throughout the underlying record contradict Dr. Nanavati's highly restrictive Medical Source Statement. *See Rorick v. Colvin*, 220 F. Supp. 3d 230, 238–39 (N.D.N.Y. 2016) (affirming an ALJ's decision to discredit treating physician's assessment where the rationale was clear, and the ultimate determination was supported by substantial evidence). Notably, the ALJ's opinion directly states her reasons for assigning little weight to Dr. Nanavati's statement, including the fact that it conflicted with other reports that Plaintiff's pain had reduced with physical therapy, and physical examinations that revealed normal findings including normal gait, full strength in her upper and lower extremities, normal range of motion, and an ability to get on and off the exam table without assistance. (*See* R. 21, citing to record evidence contradicting Dr. Nanavati). Specifically, the ALJ cites Dr. Ganesh, who assessed Plaintiff's condition after the

20

motor vehicle accident.  (*See* R. 22, 473–76).  Dr. Ganesh concluded that Plaintiff had no gross limitations to sitting, standing, walking, or climbing, and only mild to moderate limitations in the amount he could lift, carry, push, and pull.  (R. 473–76).

In addition, Dr. Nanavati's assessments conflicted with Plaintiff's own descriptions to other examiners about her daily activities, which included: cooking, cleaning, laundry, driving and shopping.  (*See, e.g.*, R. 474, 469).  Further still, the record shows that Plaintiff initially presented to Dr. Nanavati for her accident-related back pain, but within months began reporting to Dr. Nanavati that she experienced *no* musculoskeletal pain at all.  (*Compare* R. 370, 379, 383, *with* R. 397, 412, 428, 801).  Thus, Dr. Nanavati's highly restrictive assessment appears both internally inconsistent with his own records, and inconsistent with the record evidence as a whole.  *See Micheli v. Astrue*, 501 F. App'x 26, 28–30 (2d Cir. 2012) (affirming ALJ's decision to assign less weight to a treating physician's opinion where that opinion was internally inconsistent); *see also Martinez v. Colvin*, 286 F. Supp. 3d 539, 544–45 (W.D.N.Y. 2017) (affirming the ALJ's decision to assign little weight to a treating physicians opinion where that opinion was in conflict with the physician's own treatment records).

Further, as the Government notes, the ALJ looked at the level of treatment received, which only involved conservative methodologies, including: prescription medication, injections, hot/cold packs, electrical nerve stimulation, and physical therapy.  (*See* Dkt. No. 13, p. 7). Indeed, the ALJ's decision states that:

> Although the record shows that the claimant was involved in a car accident in June of 2014 that precipitated her pain symptoms, there is no evidence that the claimant is incapable of performing any work.  The record shows that the claimant's gait and station were generally normal, and she was in no acute distress.  She had 5/5 strength in her upper and lower extremities and did not evidence any sensory or neurological deficits.  The claimant's grip strength and finger dexterity were also intact.  She did not need surgery or

21

> inpatient treatment for her back disorder, and she felt improvement
> with pain medications, physical therapy, and epidural injections.
> This evidence is inconsistent with Dr. Nanavati's [Medical Source
> Statement].

(R. 21). Moreover, despite assigning "little weight" to Dr. Nanavati's Medical Source

Statement, the ALJ still incorporated a number of physical limitations in her RFC determination,

including, among others: (1) occasional ability to climb ramps and stairs; (2) an inability to

balance and crawl; (3) no ability to climb ladders, ropes, or scaffolds; and (4) occasional ability

to balance, stoop, crouch, kneel, or crawl. (*See* R. 14). The ALJ also noted that many of

Plaintiff's clinical abnormalities had been described as slight or mild and were limited overall.

(R. 15–17).

Therefore, the Court finds that the ALJ's treatment of Dr. Nanavati's Medical Source

Statement was supported by sound reasoning in view of the entire record, and was sufficiently

explained in her decision. *See Gonzalez-Cruz v. Comm'r of Soc. Sec.*, 294 F. Supp. 3d 164, 188–

91 (W.D.N.Y. 2018) (affirming the ALJ's assignment of "little weight" to a treating physician's

opinions where those opinions were inconsistent with the record evidence); *Church*, 195 F. Supp.

3d at 453–54 (rejecting the plaintiff's challenge to the ALJ's rejection of treating physician's

opinion where that assessment was unsupported by the record); *Smith v. Berryhill*, 254 F. Supp.

3d 365, 377–78 (N.D.N.Y. 2017) (holding that the ALJ did not err in discounting treating source

opinions that were inconsistent with the record as a whole); *Cornell v. Astrue*, 764 F. Supp. 2d.

381, 396–98 (N.D.N.Y. 2010) (same).[1] There was no error on this basis.

---

[1] Plaintiff's arguments against the ALJ's decision to give great weight to Dr. Ganesh is equally unavailing. (*See* R. 22–23). Specifically, the Court finds Dr. Ganesh's opinion that Plaintiff had "no gross limitations for sitting, standing, and walking," with "mild limitations for lifting, carrying, pushing and pulling" was consistent with the medical evidence at the time that assessment was conducted. *Compare* R. 473–76 (Dr. Ganesh finding mild physical limitations in January 2015), *with* R. 801 (Plaintiff "den[ying] musculoskeletal symptoms" at January 2015 appointment with NP Stucker).

## 2. Evaluation of the Medical Evidence

Next, Plaintiff asserts that the ALJ failed to properly weigh the medical evidence in determining her RFC. (*Id.*, pp. 23–26). Plaintiff contends that the ALJ's decision demonstrates "[t]he ALJ's agenda to 'cherry pick' statements from the records that purportedly show Plaintiff not disabled . . . ." (Dkt. No. 11, p. 24). In response, the Government argues that the ALJ properly executed her "duty to resolve genuine conflicts in the medical evidence," and accurately "looked at treatment notes, analyzed the findings, and noted where Plaintiff's complaints were not corroborated by the medical evidence . . . ." (Dkt. No. 13, p. 5).

Although an ALJ may not "simply pick and choose from the transcript only such evidence that supports his determination," *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004), "[a]n ALJ has an independent duty to resolve ambiguities and inconsistencies." *Pope v. Barnhart*, 57 F. App'x 897, 899 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(c)). In doing so, the ALJ may "choose between properly submitted medical opinions." *Reithel v. Comm'r of Soc. Sec.*, 330 F. Supp. 3d 904, 912 (W.D.N.Y. 2018) (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)). Further, although an ALJ cannot substitute her own lay opinion in place of established acceptable medical authorities or treating sources, she is entitled to weigh all of the evidence available to make an RFC determination that is consistent with the record as a whole. *Id*.

Here, the ALJ's assessment of Plaintiff's ability to perform light work is supported by substantial evidence. Specifically, the ALJ's assignment of great weight to Drs. Ganesh and Noia was consistent with the record as a whole. While Plaintiff contends that the ALJ improperly evaluated the severity of her impairments, the record shows that the ALJ reviewed and weighed the evidence with careful attention. The Court finds that that there is ample

evidence in the record to support the ALJ's RFC determination for light work, which is defined in the Regulations as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567. The ALJ determined that Plaintiff was capable of light work with certain additional restrictions given her physical, pain-related limitations. (R. 14–23). Even setting aside Dr. Ganesh's assessment that Plaintiff had "no gross limitation sitting, standing, and walking . . . [with] mild limitation lifting carrying, pushing, and pulling," (R. 476), the record supports the ALJ's RFC determination. Notably, as the ALJ's decision states, Plaintiff was frequently documented with no gait disturbance, normal strength in her extremities, and full range of motion in her cervical spine, despite her complaints of pain. (*See, e.g.*, R. at 334, 425, 476, 653, 707, 844, 845, 924). Those medical findings comport with the ALJ's RFC determination that Plaintiff was capable of light work.

Therefore, the Court finds that the ALJ properly considered Plaintiff's medical record as a whole and properly balanced the evidence within her discretion to resolve inconsistencies. Thus, a conclusion that the ALJ did not consider all the evidence or that she selectively excluded objective findings is unwarranted. *See Reithel*, 330 F. Supp. 3d at 910–12 (upholding ALJ's RFC determination for light work where medical evidence indicated that the plaintiff was observed with no gait disturbance, normal strength and full range of motion); *Sloan v. Colvin*, 24 F. Supp. 3d 315, 324–26 (W.D.N.Y. 2014) (noting that "consultative physician's opinion may

serve as substantial evidence," and finding no error in ALJ's reliance on consultative examiner's opinion in developing the RFC assessment).

### 3. Evaluation of Plaintiff's Hearing Testimony

Next, Plaintiff argues that the ALJ failed to perform the required analysis to carefully consider Plaintiff's statements about her symptoms with the rest of the medical evidence in the record. (Dkt. No. 11, pp. 26–27). Specifically, Plaintiff asserts that the "ALJ's discussion of the Plaintiff's hearing testimony is completely deficient," and that the decision "failed to indicate what [the ALJ] had evaluated concerning Plaintiff's ongoing pain and limitations." (*Id.*, p. 27). The Government responds that the ALJ need not address each of the Plaintiff's subjective complaints, and notes that the decision does discuss Plaintiff's allegations with regard to the car accident causing her medical limitations. (Dkt. No. 13, pp. 10–12). The Government further notes that the ALJ considered Plaintiff's testimony with regard to her treatment history, daily activities and ability to care for herself, go shopping, drive, and spend time with family members. (*Id.*, p. 11).

The Regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Sloan*, 24 F. Supp. 3d at 326. First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529(b)-(c). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the claimant's statements considering the

details of the case record as a whole.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).  Notably, it is the exclusive province of the ALJ to appraise the credibility of witnesses, including the claimant. *See Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

Here, contrary to Plaintiff's suggestion, the ALJ expressly considered Plaintiff's subjective statements about her symptoms.  Specifically, the ALJ states that:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 15).  Indeed, the ALJ's analysis of Plaintiff's subjective claims cites directly to Plaintiff's own statements and testimony regarding her activities of daily living and social functioning (*see* R. 13), her physical impairments (*see* R. 15), and her mental impairments, (*see* R. 22–23).  The ALJ noted that, according to Plaintiff's testimony and reports, she was able to engage in daily activities, bathed and dressed herself, and could perform limited cooking, cleaning, laundry, read, manage money, use public transportation, and socialize with family.  (*See, e.g.*, R. 12, 15, 21–22).  The ALJ also noted numerous objective medical evidence which did not match Plaintiff's alleged symptoms.  (R. 15).  The ALJ ultimately concluded that "the medical record shows that [Plaintiff's] conditions are far less limiting than alleged."  (R. 15).

Therefore, the Court cannot say that the ALJ conducted a legally insufficient analysis of Plaintiff's subjective complaints.  *See Miller v. Colvin*, 85 F. Supp. 3d 742, 756–57 (W.D.N.Y. 2015) (affirming the ALJ's decision to discredit the plaintiff's subjective complaints where substantial evidence supported the ALJ's credibility finding); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270–72 (N.D.N.Y. 2009) (same).  There was no error on this basis.

#### 4. Development of the Record

Plaintiff also argues that the ALJ failed to develop the record by not requesting a functional assessment of Plaintiff's mental limitations from her provider. (Dkt. No. 11, pp. 27–28). The Government contends that Plaintiff's argument fails because: (1) an ALJ can reach an RFC without any supportive Medical Source Statement; and (2) the ALJ relied on the opinion of a consultative examiner when determining the severity of limitations caused by Plaintiff's mental impairments. (Dkt. No. 13, p. 8–9). The Government also notes that Plaintiff requested additional time to obtain and submit a Medical Source Statement regarding her mental impairments, but failed to do so. (*Id.*, p. 9).

It is well-established that "[t]he ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). However, an ALJ's failure to obtain a Medical Source Statement from a treating physician before making a disability determination is not necessarily an error requiring remand. *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013); *see also Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) ("[T]his Court does not always treat the absence of a medical source statement from a claimant's treating physicians as fatal to the ALJ's determination."). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

Here, the Court finds no error in the ALJ's development of the record. Plaintiff's argument that the ALJ did not account for her limitations as a result of depression and anxiety is

unpersuasive for several reasons.  First, Plaintiff fails to articulate what limitations she experienced due to her mental conditions that were not already accounted for in the ALJ's RFC. As the Government points out, Plaintiff does not even challenge the "mental portion" of the ALJ's determination that Plaintiff was capable of performing simple, routine, repetitive tasks. (Dkt. No. 13, p. 10).

Second, contrary to Plaintiff's assertions, the ALJ's decision discusses Plaintiff's struggle with depression and anxiety at length and analyzes Plaintiff's mental health record in detail. (*See, e.g.*, R. 19–21).  Within that discussion, the ALJ evaluates medical records from: Dr. Nanavati, Plaintiff's primary care provider (R. 19–20); Dr. Noia, the consultative psychiatrist (R. 19–20); Dr. Verma, Plaintiff's neurologist (R. 20); and records from Plaintiff's visits to Psychological Healthcare and The Neighborhood Center (R. 20–21).  Significantly, the ALJ gave Dr. Noia's opinion great weight, writing that:

> Dr. Noia opined that the claimant appeared to have no limitations in understanding and following simple instructions, performing simple tasks or complex tasks, maintaining attention and concentration for tasks, attend to a routine, and maintain a schedule.  She had no limitations in learning new tasks and making appropriate decisions. She could interact moderately well with others and has occasional, mild limitations in dealing with stress. . . .  Specifically, Dr. Noia noted that the claimant's manner of relating, social skills, and overall presentation were adequate.  Her expressive and receptive language skills were adequate, and her thought processes were coherent and goal-directed, her mood was calm, and she appeared relaxed and comfortable.

(R. 22).  Ultimately, after considering all of the evidence regarding Plaintiff's mental health, the ALJ reasonably concluded that "[Plaintiff's] depression would be accommodated by a residual functional capacity that limits her to simple, routine, repetitive tasks."  (R. 21).  Thus, the record clearly shows that the ALJ considered Plaintiff's mental impairments with due care.  *See Micheli*, 501 F. App'x 26, 29–30 (2d Cir. 2012) ("[T]he ALJ will weigh all of the evidence and

see whether it can decide whether a claimant is disabled based on the evidence he has, even when that evidence is internally inconsistent."). Given the already voluminous medical evidence regarding Plaintiff's mental health in the record, the ALJ properly determined that she could render a decision without further development.

The Court concludes that there is substantial evidence to support the ALJ's assessment with respect to the psychiatric portion of the RFC determination. *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d. Cir. 2013) (concluding that ALJ had no obligation to supplement record by acquiring additional medical information where ALJ had all of the claimant's treating physician's treatment notes and consulting examining physician's opinion supported ALJ's assessment of RFC); *Reithel*, 330 F. Supp. 3d at 912–13 (rejecting the plaintiff's argument that the ALJ did not rely on sufficient medical evidence in evaluating her mental limitations); *see also Rosa*, 168 F.3d at 79 n.5 ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information.").

### 5. Residual Functional Capacity Determination

Next, Plaintiff argues that the ALJ erred in finding that Plaintiff has the RFC for light work because that determination was not supported by substantial medical evidence. (Dkt. No. 11, pp. 28–29). The Government disagrees, arguing that "the ALJ's analysis of the evidence and RFC conclusions did not disregard the medical and opinion evidence." (Dkt. No. 13, p. 8).

For the reasons discussed above, the Court finds that the ALJ's decision properly considered the medical record and properly weighed the evidence in determining that Plaintiff maintained an RFC for light work. Because the ALJ provided reasonable supported explanations for her decision, this Court must afford the determination considerable deference and may not

substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984). Accordingly, the Court finds that the ALJ did not err in determining that Plaintiff could perform light work, subject to the identified limitations. *See Cobbins v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 126, 134–36 (N.D.N.Y. 2012) (affirming the ALJ's RFC determination where the decision "rest[ed] on adequate findings supported by evidence having rational probative force").

### 6. Vocational Expert Testimony

Finally, Plaintiff contends that the ALJ erred in relying on the testimony of a vocational expert because the expert's opinion was based on a flawed assessment of Plaintiff's RFC and failed to account for the "full extent of Claimant's impairments." (Dkt. No. 11, p. 29). The Government argues that the hypothetical presented to the vocational expert was proper because it was supported by substantial evidence and mirrored the ALJ's valid RFC determination. (Dkt. No. 13, p. 12).

In this case, the vocational expert testified that an individual with limitations consistent with Plaintiff's RFC could work as an electronics worker, a small products assembler, and a products assembler. (R. 61–65). Indeed, for the reasons discussed above, the Court has already concluded that substantial record evidence supports the ALJ's RFC finding. Therefore, the Court rejects Plaintiff's challenge to the vocational expert's determination based on the ALJ's proposed hypothetical for that RFC. *See Wavercak v. Astrue*, 420 F. App'x 91, 94–95 (2d Cir. 2011) (citing *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (noting that the ALJ may rely on testimony of vocational expert where the RFC is supported by substantial evidence)); *Miller*,

85 F. Supp. 3d at 756–57 (finding the ALJ properly relied on the vocational expert's responses to a hypothetical that was based on the ALJ's substantially supported RFC assessment).

## IV.    CONCLUSION

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision was supported by substantial evidence in the record.  Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).  After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the decision of the Acting Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case and provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:  May 20, 2019
    Syracuse, New York

Norman A. Mordue
**Senior U.S. District Judge**